**UNITED STATES of America, Plaintiff,**

**v.**

**LOUISIANA PACIFIC CORPORATION, Dana Dulohery, and Robert Mann, Defendants.**

**No. 95–CR–215–B.**

United States District Court,
D. Colorado.

May 16, 1996.

John Haried and Brenda Taylor, Assistant U.S. Attorneys, Denver, CO, for Plaintiff.

Patrick J. Burke, Law Office of Patrick J. Burke, Denver, CO and Elliot R. Peters, Keker & Van Nest, San Francisco, CA, for Defendant Louisiana Pacific.

John M. Richilano, Law Office of John Richilano and Dean S. Neuwirth, Law Office of Dean S. Neuwirth, Denver, CO, for Defendant Dulohery.

Michael R. Enwall and Barbara K. Grant, Law Offices of Michael Enwall, Boulder, CO, for Defendant Mann.

MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Defendants Louisiana Pacific Corporation (LPC), Dana Dulohery and Robert Mann (defendants) move for reconsideration of the November 28, 1995 Memorandum Opinion and Order (Order) which denied defendants' motion to dismiss counts 1 through 20 and 22 through 24 of the indictment. *United States v. Louisiana Pacific Corporation*, 908 F.Supp. 835 (D.Colo.1995). The indictment charges defendants with conspiracy to violate and violations of the Clean Air Act (CAA), 42 U.S.C. 7401 et seq., and of the False Statements Act (FSA), 18 U.S.C. § 1001. Defendants also move to strike portions of the indictment alleging violations of the FSA for filing false resin reports and continuous opacity emissions monitoring (COMS) reports after January 20, 1992 as well as overt acts in furtherance of the conspiracy to violate the FSA. Finally, defendants seek an amendment of the Order allowing evidence at trial upon the federal enforceability issue. The motion for reconsideration will be denied, the motion to strike is granted in part and denied in part, and I deny the motion to present evidence at trial on the issue of federal

enforceability of the COMS reporting requirements.

## I.

### A. Emission Monitoring under the Clean Air Act.

Defendants argue that 42 U.S.C. § 7410(a)(2)(F) and 40 C.F.R. § 51.230(e) & (f) do not require that every source install, maintain, and use monitoring devices. Rather, these provisions require a state to demonstrate in its State Implementation Plan (SIP) that it *possesses the authority,* under state law, to impose a requirement that a source submit compliance-related information and that a source use emission monitoring devices. According to the defendants, the only monitoring devices required by the CAA are those prescribed by the Administrator of the EPA. They assert that because the Administrator has not prescribed continuous opacity monitoring systems (COMS) for wafer dryers they are not required under the CAA.

■ Section 7410(a)(2) provides: "Each [state implementation] plan shall—(A) include enforceable emission limitations and other control measures, means, or techniques . . . as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter; * * * (F) require, as may be prescribed by the Administrator—(i) the installation, maintenance, and replacement or equipment, and the implementation of other necessary steps, by owners or operators of stationary sources to monitor emissions from such sources." It is axiomatic that for a state to enforce emission limitations it must have a means by which to measure emissions from a source. The precatory language of § 7410(a)(2)(F) simply allows the Administrator to set specific emissions monitoring for a source category. It does not mean that in the absence of specific emissions monitoring requirements the state cannot impose monitoring requirements which are enforceable under the CAA if contained within a permit issued pursuant to an EPA approved SIP.

As addressed fully in the Order, this analysis is consistent with § 7414 of the CAA which grants the Administrator the authority to require an owner or operator on a one-time or continuous basis to "install, use, and maintain such monitoring equipment, and use such audit procedures, or methods" to develop or assist in the development of an implementation plan. 42 U.S.C. § 7414(a)(1)(C). This authority was delegated to the Colorado Department of Health under § 7414(b)(1). 42 U.S.C. § 7414(b)(1). However, under § 7414(b)(2) the Administrator retains concurrent enforcement jurisdiction. 42 U.S.C. § 7414(b)(2). Therefore, the inclusion of the COMS requirement in LPC's 1988 permit was a permissible delegation of authority enforceable under the CAA. Reading § 7410(a)(2)(A) & (F), 40 C.F.R. § 51.230 and § 7414 *in pari materia,* it is clear that the state must possess the authority to implement emission monitoring requirements and it must exercise that authority to insure that the emission limitations are enforceable. In the absence of specific requirements by the Administrator, the choice of such monitoring requirements is left to the discretion of the state.

### B. Colorado's Permitting Program was an Approved EPA Permitting Program.

Defendants next argue that the 1988 permit is not federally enforceable because it was not issued pursuant to a federally approved operating permit program. They assert that the holding of *National Mining Ass'n v. EPA,* 59 F.3d 1351, 1363 (D.C.Cir. 1995), is not applicable to this case because the permit there was issued pursuant to an approved Title V permitting program under the 1990 amendments. 42 U.S.C. § 7661 et. seq. The issue, however, is not whether the 1988 permit is a Title V permit but, rather, whether the 1988 permit contains requirements that were included in an EPA approved permitting program. *See United States v. Marine Shale Processors,* 81 F.3d 1329, 1354 (5th Cir.1996). "Congress gave the United States the power to enforce state air permits in part in order to prevent a destructive race among states to attract industry by adopting the least stringent emissions-limits." *Id.* (Interpreting 42 U.S.C. § 7413(b)(1)). The terms "federally enforceable" must, therefore, be construed in harmony with this purpose.

The 1988 permit is an "emissions permit" issued under C.R.S. § 25–7–114, entitled "Air pollutant emission notices and emission permits." Pursuant to this section, any source which emits air pollutants, other than a residence, must file an emission notice with the CDH. C.R.S. 25–7–114(1). Before constructing or altering a source or facility an operator must obtain a valid permit from the CDH. C.R.S. § 25–7–114(4). To obtain a permit the applicant must follow an administrative process during which there is opportunity for public comment, C.R.S. § 25–7–114(4)(e), and opportunity for the applicant to contest the proposed permit conditions. This permitting process is required by 42 U.S.C. § 7502(b)(5) which provides: "Such plan provisions shall require permits for the construction and operation of new or modified major stationary sources anywhere in the nonattainment area...."

The 1988 permit process met the 1981 requirements of 42 U.S.C. § 7502 & 7503 for permitting of new or modified major stationary sources in nonattainment areas. 46 FR 24180. As pointed out by the Fifth Circuit in *Marine Shale*, the CAA has always required a preconstruction review program. *Marine Shale*, 81 F.3d at 1356–58. The CAA and its implementing regulations require that a state consider the impacts on attainability of air quality standards before permitting new sources which emit pollutants to be constructed. 42 U.S.C. §§ 7410(a)(2)(C), 42 U.S.C. §§ 7502, 7503: 40 C.F.R. Part 51.

The Colorado permitting program covers the construction or modification of any source whether in a nonattainment or attainment area. The Colorado Common Provisions Regulations are regulations adopted and approved by the EPA to implement the Colorado Air Quality Control Act. C.R.S. 25–7–101 et seq. The Colorado Air Quality Control Act is also the Colorado State Implementation Plan. The Common Provisions Regulations provide: "Federally enforceable" is defined in the Common Provisions Regulations as "all limitations and conditions which are enforceable by the EPA administrator, including ... requirements within any applicable State Implementation Plan, *any permit requirements established pursuant to*

*40 CFR 52.21 or under regulations approved pursuant to 40 CFR Part 51, Subpart I, including operating permits issued under an EPA-approved program that is incorporated into the State Implementation Plan and expressly requires adherence to any permit issued under such program...."* Common Provisions Regulations I.G. (emphasis added). This definition appears consistently throughout the Code of Federal Regulations. *See e.g.* 40 C.F.R. 51.165; 40 C.F.R. 51.166; 40 C.F.R. 51.301; 40 C.F.R. 52.21.

■ Defendants assert that the 1988 permit issued under C.R.S. 25–7–114 was a "new source review permit" under 40 C.F.R. § 51.160 and not an "operating permit." Common Provisions Regulation II.B which is part of the implementing regulations for C.R.S. 25–7–114 provides: "The Division may require owners or operators of stationary air pollution sources to install, maintain, and use instrumentation to monitor and record emission data as a basis for periodic reports to the Division." Pursuant to this authority, the CDH required LPC to install COMS and provide periodic reports. The permit application was submitted to the EPA pursuant to C.R.S. § 25–7–206(3). Defendants' protestations to the contrary notwithstanding, the COMS requirement is federally enforceable because it is contained in a permit issued pursuant to an EPA approved permitting program. The new source review standards in 40 C.F.R. 51.160 are contained in 40 C.F.R. Part 51 which by definition are federally enforceable. The 1988 permit was issued pursuant to 40 C.F.R. 51.160 without which LPC could not have commenced operations. Therefore, it was an operating permit. Section 25–7–114's permitting program is part of the approved Colorado SIP. The 1988 permit specifically states that adherence to the terms of the permit is required and that failure to comply may result in civil or criminal penalties. Thus, as a matter of law, the 1988 permit was an *operating permit[] issued under an EPA-approved program that is incorporated into the State Implementation Plan and expressly requires adherence to any permit issued under such program* and is, therefore, federally enforceable.

### C. COMS Monitoring and Reporting were Properly Required under the Federal Regulations.

■ Defendant's next argue that the COMS requirement is not federally enforceable because the state of Colorado did not comply with 40 C.F.R. 51.214. Defendants offer nothing new in support of this contention. As addressed in the Order, § 51.214 applies to COMS requirements applicable to a category of sources. Here, the COMS requirements in the 1988 permit are substantially the same as those set forth in § 51.214. They comply with the purposes of § 51.214 and derive from authority within the SIP. Consequently, the motion to reconsider the application of § 51.214 is denied.

### D. Presentation of Federal Enforceability at Trial.

Defendants' argue that the Constitution requires they be permitted to present evidence at trial on the issue of federal enforceability. They contend that the issue of federal enforceability is an element of the crime charged which must be determined by the jury not the court. Comprehensive briefing and review of this issue has led me to conclude that as a matter of law the COMS reporting requirements of the 1988 permit are federally enforceable. Thus, the jury, as trier of fact cannot address this question. Because this is purely a question of law, defendants have no constitutional right to jury consideration of it.

### II.

The defendants move to strike various portions of the indictment alleging falsification or overt acts furthering the falsification of reports subject to the FSA. Defendants contend that the following paragraphs should be stricken: paragraphs 14(c) and 14(g) of Count I; alleged COMS violations after January 20, 1992 including: paragraph 14(e), paragraph 14.a.1.—January 31 and February 1, 1992; paragraph 14.a.7.—January 21, and 23, 1992; paragraph 14.a.8.—tampering with the monitor lens on various days up to June 1992; paragraph 14.a.9.—tampering with the monitor strip chart mechanism throughout June 1992; paragraph 14(e)—change of the established reason code # 14 on February 4, 5, 12, 13, 15, 16, 18, 22, 23, 24, 27, March 2 through 22, 28, 29, and April 2, 5, 9, 10, 11, 18, and 27; and paragraph 14(g) alleging that defendants made airboard up through June 1992.

To establish a violation of the FSA the government must prove "1) that the defendant made a statement, 2) that the statement was false and the defendant knew it was false, 3) the statement was made knowingly and willfully, 4) the statement was within the jurisdiction of the federal agency and 5) the statement was material." *United States v. Kingston,* 971 F.2d 481, 486 (10th Cir.1992). Defendants contend that for FSA jurisdiction to exist the false statement must fall into one of two categories: (1) the false statement caused federal funds to be dispersed to the defendant or (2) the false statement is contained in information used by the federal agency to ensure federal funds provided to the state or local agency are used properly. The defendants, thus, argue that there must be a link between federal funds provided and used by the state agency. I disagree.

■ The Supreme Court in *United States v. Rodgers,* 466 U.S. 475, 480, 104 S.Ct. 1942, 1946, 80 L.Ed.2d 492 (1984), stated "in *United States v. Gilliland,* supra., 312 U.S. at 91, 61 S.Ct. at 521, we rejected a defendant's contention that the reach of the statute was confined 'to matters in which the Government has some financial or proprietary interest.' * * * The most natural, nontechnical reading of the statutory language is that it covers all matters confided to the authority of an agency or department." *Id.* Contrary to the defendants assertions, there need not be a financial link between the use of federal funds and the false statement for the FSA to apply.

Relying on *United States v. Allemand,* 34 F.3d 923 (10th Cir.1994), and *United States v. Kingston,* 971 F.2d 481 (10th Cir.1992), the government contends that making or filing false forms violates the FSA regardless of whether one has a duty to file them. However, this is an overstatement of the law as set forth by the Tenth Circuit.

**1489**

In *Allemand* the defendant was convicted of violating 16 U.S.C. § 3372(d)(2) "which makes it 'unlawful for any person to make or submit any false record' for any wildlife 'which has been, or is intended to be ... transported in ... foreign commerce.'" *Allemand*, 34 F.3d at 927 (quoting 16 U.S.C. § 3372(d)(2)). Citing *United States v. Kingston*, the Tenth Circuit stated: "Making or submitting false forms violates *this* law regardless of whether one has a duty to supply them." *Id.* (emphasis added). In *Kingston*, the defendant was charged with causing an applicant for a HUD loan to make false assertions of fact on HUD loan forms by stating that she had provided the earnest money and closing costs for the two HUD-financed loans she obtained. The defendant argued that he did not violate § 1001 because no statute or regulation required the purchaser of a HUD-financed property to provide the earnest money and closing costs. The Tenth Circuit disagreed stating:

> Whether or not the law required that the purchaser of a HUD-financed home supply the earnest money and closing costs is irrelevant for purposes of § 1001. What is relevant is whether [defendant] was aware of the HUD policy which required the purchaser to supply the earnest money and closing costs out of his or her own funds and willfully and knowingly attempted to circumvent that policy by causing Ms. Million to portray the funds as her own on the HUD forms.

Thus, contrary to the government's assertions, the HUD forms at issue did require the defendant to make a representation which was relied upon by HUD in making its determination whether to provide financing. *Allemand* and *Kingston* teach that it is the underlying statute which must be analyzed to determine whether the alleged false statement falls within the purview of the FSA. The government does not have to prove that the statement was made directly to a federal agency but must prove a nexus between "the deception of the nonfederal agency and the function of a federal agency." *United States v. St. Michael's Credit Union*, 880 F.2d 579, 591 (1st Cir.1989).

Based on my analysis of the terms "federally enforceable," it is clear that reporting requirements in a SIP or permit would be "matters confided to the authority of the EPA." Under the CAA, the EPA also retains that authority to enforce the CAA, 42 U.S.C. § 7413, to require reports, monitoring, and record keeping, 42 U.S.C. § 7414(a)(1), and to conduct inspections to ensure compliance. 42 U.S.C. § 7414(a)(2). Hence, reports submitted to the implementing state agency as required by a permit issued under a SIP are relied upon by the EPA and, therefore, within the EPA's jurisdiction. The issue is whether the false statements submitted to the state agency which are not required by the permit or SIP are "matters confided to the authority of the [EPA]."

Paragraph 14(c) alleges that defendants submitted production and consumption reports which falsely understated LPC's use of phenolic formaldehyde resin (resin). The resin reporting requirements were not in the permit or in the SIP. Moreover, there is currently no federal authority to regulate resin. Consequently, the resin consumption reports are not within the jurisdiction of the EPA. Likewise, paragraph 14(g) alleges that defendants created false production figures as part of Montrose mill's permanent records. The government alleges that these production reports are within the purview of the FSA because the EPA has the authority to conduct inspections of all records kept by LPC under § 7414 of the CAA. The fact that EPA can conduct an inspection during which these production reports might be reviewed is not a sufficient nexus to find that the production reports were "within the jurisdiction of the EPA." Accordingly, the motion to strike ¶¶ 14(c) and 14(g) is granted.

Defendants argue that alleged COMS violations occurring after January 20, 1992 are not actionable under the FSA because the 1992 permit did not require COMS monitoring and reports. Therefore, these reports were not within EPA's jurisdiction. LPC, however, does not contest that it continued to submit COMS reports after January 20, 1992 until the wet-ESP was installed. The government contends that the CDH and EPA

continued to rely on these reports to determine whether LPC was complying with the 20% opacity level and that LPC knew of such reliance. Consequently, the statements were within EPA's jurisdiction.

The government cites *United States v. Wright*, 988 F.2d 1036, 1039 (10th Cir.1993) for the proposition that a state's use of federal funds standing alone is sufficient to establish jurisdiction under § 1001. There, the defendant submitted false reports containing water quality data *required by regulations promulgated by the Environmental Protection Agency* under the Safe Drinking Water Act, 42 U.S.C. § 300f–300k, to the Oklahoma State Department of Health (OSDH). *Id.* at 1036 (emphasis added). Although the state had primary enforcement power for violations of the Safe Drinking Water Act, EPA conducted semiannual reviews and audits of the program to ensure compliance. The EPA also provided federal funding for the program. *Id.* at 1037–38. The Tenth Circuit held that the false statements related to the collection and reporting of turbidity data clearly fell within EPA's authority because the data was required by regulations promulgated by the EPA. *Id.* at 1039. Moreover, funding of the OSDH program was based in part on the results of the annual evaluations. There was a clear connection between the grant of federal funds based on the effectiveness of the program as demonstrated in part by the water quality data filed.

Here, as in *Wright*, the EPA conducts formal reviews of Colorado's clean air program. These reviews are tied to annual grants of money from the EPA under 42 U.S.C. § 7405. *Wright*, however, is distinct from this case because the water quality data reports were required by EPA regulations and were in place and effective at the time of the alleged false statement. The defendant, thus, had a duty to file such reports as mandated by the EPA. In contrast, the COMS reports filed after January 20, 1992 were not specifically required by EPA regulation nor by the 1992 permit. Although the EPA regulations require that emissions be monitored, the choice of the monitoring method for this type of stationary source is not mandated. Consequently, after January

of 1992, the COMS reporting requirement was not effective.

■ The analysis, however, does not end here. *Kingston* teaches that although there is no duty to make a report, a willfully made material false statement within the jurisdiction of a federal agency may be actionable where a defendant is aware of a policy of the federal agency and willfully and knowingly attempts to circumvent that policy. *Kingston*, 971 F.2d at 488. Viewing the facts most favorable to the government as I must, it can be inferred that LPC knew that the COMS reports were used by the CDH and, thus, by the EPA to determine compliance with the 20% opacity limitation and voluntarily caused false statements to be made in order to circumvent this policy. Hence, there is a sufficient nexus between the deception of the CDH and the function of the EPA to find that the statements are within the jurisdiction of the EPA. Applying *Wright* and *Kingston* together, I conclude that the COMS reports filed after January 20, 1992 were within the jurisdiction of the EPA. Accordingly, I deny the motion to strike the allegations in paragraphs 14.a.1., 14.a.7., and 14.a.8. The post January 20, 1992 allegations in paragraphs 14.a.9. and 14(e) allege overt acts in furtherance of the conspiracy alleged in paragraphs 14.a.1., 14.a.7., and 14.a.8. Consequently, I deny the motion to strike the post January 1992 allegations in these paragraphs.

Accordingly it is ORDERED that:

1) Defendant's motion for reconsideration is DENIED;

2) Defendant's motion to strike is GRANTED in part and DENIED in part as set forth above; and

3) Defendant's motion to amend the November 28, 1995 Order regarding the presentation of the federal enforceability issue to the jury is DENIED.